Good morning, your honors. May it please the court. I submit in this case, your honors, that the district court erred in refusing to give the jury instruction consumer expectation test. What did you say, refusing to give it? You requested it? We did, your honor. And I would further submit that a fair reading of the case law in California, let alone in other states, which are cited in the brief, Illinois, Florida, and some others, that it supports its application here in this case. Specifically with regard to auto You're urging that it was a design defect that caused the death of Mr. Edwards in this case, is that right? Yes, your honor. And as you understand, under the consumer expectation test, the product must fail in a manner that is within the ordinary user's everyday experience, is that right? That is correct, your honor. So can you talk to us a minute about how a rollover is in the ordinary experience of the average driver? Certainly, I would be happy to, your honor. And to give it a little bit of context, in the auto defect arena, or in those types of cases, the consumer expectation test has been applied to seat back cases where you've got high speed, 50, 80 mile an hour, rear end crashes, and a seat breaks, airbag cases, both when air In all of those cases, the seat was moving in the direction opposite, you know, the direction in which you would expect the seat to move if you're rear ended. That's why the court ruled as it did, is that right? Agreed, your honor. That was my trial, the Romine case I believe that you're referring to. We've got a pretty good handle on the other cases. Let's focus on these facts since your time is short. So your theory as to the cause of the accident is the degree of crumple on the roof. Yes, your honor. Just in layman's term here, like how much the roof should have collapsed in. How is that within the ordinary consumer's experience? Okay, so Or is the theory in conjunction with the side airbag? And if so, play that out. Two issues. So I'll address the airbag issue secondly, with regard to how this is within the realm of the ordinary consumer, just like the airbag cases, seatbelt cases. When you say this, what are you referring to? The roof crush, your honor. You mean, not just, you mean, you mean the degree of roof crush? Correct, your honor. No, right? The difference is your expert said it should have been only three inches instead of eight inches, right? It was actually more than that because it was lateral and down. It was down almost on the dashboard. They say it was lateral too, but so it's in the reasonable experience of the ordinary consumer that on a multiple rollover, the roof wouldn't crush more than three inches and laterally more than X degrees. Is that what you're saying? No, not really to that. Well, what is the ordinary experience? So here's what we're trying to say. The ordinary consumer drives vehicles, okay, and they have certain minimum safety assumptions based on those vehicles depending on the issue. The ordinary consumer has been marketed for the last 30 years SUVs. They're big, they're safe, they're built Ford tough, you can take them off road. The ordinary consumer has been warned by all these manufacturers. They're also more prone to rollovers. Huh? They're also more prone to rollovers. Exactly my point. That's where I was going to go. It's right in the visor. This thing's going to rollover. So you've got a vehicle that's been marketed as Ford tough. You can take them off road. They might rollover. I would submit that the ordinary consumer would have some sort of minimum safety assumption when they're in that vehicle. Is that roof your roll cage? Is that your safety cage? Would the ordinary consumer expect, as Judge Tshishima was alluding to, that the roof would collapse X number of inches if you're going a certain miles per hour, and then a fewer number of inches if you were going slower? Would an ordinary consumer go through all of those mechanical, mathematical gyrations? No, Your Honor, and if that was what we led the court to believe in the brief, that's not really the point we're trying to make. Obviously, in a rollover crash, there's going to be some deformation of the roof. In this case, we had a catastrophic failure as though it were made out of aluminum foil. Mr. Edwards, half his body was ejected outside of this vehicle with no roof covering him. He was exposed to the elements and getting killed every time this thing rolled over. So I submit whether it's… That's a side airbag issue, right? No. That's not a collapsed roof issue. No. The short answer is no, but you can use both. If a roof stays intact, our argument is, and the experts' is, you stay inside the car, and you're not going to be partially ejected from here up and exposed to the elements. A secondary argument can be if you're going to have a roof collapse like that, then you should have a rollover airbag in it to help prevent against that. But they really are two separate and distinct theories. The focus here is with the way these vehicles have been marketed for the last 30 years as rough and tumble vehicles, does the ordinary consumer have a minimum safety assumption? Did they ever market it and say you're going to survive a rollover? It's Ford Tough, hence you'll survive a rollover. Was that ever part of a marketing campaign? No, Your Honor. I don't believe they've ever said that. It's just, I believe, just like the ordinary consumer with regard to the seats. I mean, the ordinary consumer has not been rear-ended at 80 miles an hour. But they've got an expectation. I think my seat's not going to fail and kill me. Or they don't. They might say, hey, I don't know. All bets are off. Does it matter whether the product was being used for its intended use? This vehicle was being used for its intended use. It was driving home from Northern California. Yeah, but he kind of swerved off the road. There was stopped traffic. He was driving too fast to stop safely. He snatched it off, hit the side, and then bad things happened. Is that the intended use? Well, actually, that is a reasonably foreseeable use. Accidents happen every day on the roadway. Someone stops or brakes in front of you, you either rear-end them or swerve. Someone slammed the brakes on in front of him and he swerved out of the way. Can you talk about your theory as to the side airbag? Sure. Well, the argument on the side airbag, which is not relevant for, and I'd be happy to address that, though, with regard to the consumer expectation issue. But the argument on the side airbag, we weren't trying to pursue consumer expectation tests on that theory per se. That was more of a risk-benefit theory. You're not pursuing that now, are you, that theory? Not with regard to the issues here. Really, the sole issue before this Court is, like with high-speed rear-end crashes, airbags, and seatbelts, does a consumer have an expectation of what their roof would do in a rollover? And I would submit, based on people seeing rollovers, I've had a family member involved in one. I mean, a lot of people have experience, either directly or indirectly, through family members or driving down the roadway and seeing what roofs do. And in this instance, this thing collapsed, had somebody's body 50% out of the vehicle, and it had a catastrophic failure as though it were made out of aluminum foil. I think a consumer would say, you know, I might expect some damage and some dents in my vehicle, but I certainly don't expect that, and maybe I'm wrong. Maybe they look at that and go, hey, all bets are off. But I think a consumer, an ordinary consumer, does have minimum safety assumptions with regard to how that roof would perform in a reasonably foreseeable role. There were other passengers in the vehicle, right? Yes, Your Honor. And tell me, remind me of the extent of the injuries of the other passenger. Yeah, the person that had the roof over their head essentially walked away. They were injured, but nothing catastrophic. Okay. Which is often the case in these types of cases. When the roof collapses, the person with no roof dies or is paralyzed. When the roof doesn't collapse, people walk away. But the roof collapsed, and one of the other passengers survived and is not paralyzed. Well, the roof didn't collapse on his side. Typically, in a rollover case, and in this case in particular, but this is standard, whichever way a vehicle is rolling over, whoever is lucky and is going on the side over first, in this case the passenger, the roof doesn't collapse. The car comes back around, and on what they call the trailing edge side, that one comes down. That's where the roof collapses. So typically in these cases, if you have a driver and a passenger, whoever goes over first lives. Whoever goes over second is dead or paralyzed. How long was the jury out? Excuse me? How long was the jury out, if you recall? You know, I'll let counsel correct me if I'm wrong. I want to say three or four hours, but I'm not 100 percent sure. So what you're asking for is to send it back for a retrial on the consumer expectation test as to the roof. Yes, Your Honor, we are. And I'd like to reserve the rest of my time unless the Court has any further questions on that.  Okay. Thank you, Your Honor. Thank you, Your Honors. Appreciate it. Good morning. May it please the Court. Emily Quatto on behalf of Ford Motor Company. The California Supreme Court's decision in Sewell is directly on point and answers the question presented here. That case holds that the ordinary consumer of an automobile simply has no idea how safe an automobile can be made for all foreseeable situations and how and when the issue is whether how the structure of an automobile should survive an accident, when the question of defective Well, SEWELL doesn't stand for the proposition or preclude the proposition that a consumer should expect the product or in this case the Ford roof not to totally collapse. Is that right? Well, SEWELL makes clear that whenever the question of defect turns on an analysis of technological feasibility and the balances of risks and benefits and how a product like this should be designed differently, the consumer expectations test simply has no role to play because consumers can't answer that question based on their ordinary experience. It requires expert testimony to illuminate how to design the roof to survive a rollover and how the roof could be designed to survive that to a reasonable degree. But hasn't that same test been applied in rear-enders and airbag cases? First of all, SEWELL is the controlling Supreme Court case.  We don't doubt that. We're not inconsistent with SEWELL. Romine is inconsistent with SEWELL. We think Romine is wrongly decided. It doesn't apply SEWELL correctly. But even assuming that Romine was properly decided, consumers do have everyday experience with rear-end accidents and they sit in seats every day. So you can distinguish it on the basis of consumers have no idea how a roof is going to perform in a multiple rollover accident. In the airbag cases, I think very well. I think consumers have the right to expect the roof of the vehicle not to totally collapse. But the roof didn't totally collapse as if there was no roof, as plaintiffs indicate. Well, I mean, as plaintiffs counsel argue, arguably it is within the common consumer experience to expect that the roof would serve as a cage of sort to protect your head, right? So it's like the difference between choosing a vehicle with a hard roof versus a soft top. Because you expect the roof to provide that sort of protection. I'm not sure consumers would expect that. But even if we assume that they do, the question is how much. Wait a minute. You would expect the consumer to expect to have more protection with a hard top than with a, like, a convertible with the top up, like a soft top. Yes, the consumer would, you know, you would expect more protection from a variety of the elements in a, you know, car with a hard top than you would in a convertible. Here I would note that the roof, that the window is down. So this is sort of similar to a convertible in this case. But even assuming consumers have some expectations that, you know, they will have some amount of protection from the roof, the question of how much, three inches versus six inches, is a question that really requires expert testimony to illuminate. Because consumers don't know how much roof crash that a manufacturer can actually design a vehicle to withstand. Wouldn't a manufacturer be in a unique position in doing the crash test to be able to determine how much a roof should be able to collapse and still to protect the driver? So in allocating the risk, wouldn't it make more sense to allocate that risk to the manufacturer as opposed to the consumer? Well, that's why strict liability applies in these cases. But the question is what test do we apply to determine whether it's defective? And what you're saying is exactly why the risk-benefit test applies. Because we need to look at what the manufacturer is looking at when it's designing the vehicle to determine if there's something wrong with the roof. And we can't look to ordinary consumer expectations to determine that. We need to look at what the manufacturer is looking at when it's designing the car. Did the evidence show that the manufacturer expected the roof to crush whatever it was, eight or nine inches in this kind of rollover? Well, I think the – Did it show that or not? Did the record show that the – I think the manufacturer would expect in an accident of this magnitude, the roof not to be able to withstand all deformation. And how much deforms is really going to depend on the specific unique circumstances of the accident. So exactly how many inches of deformation is hard to determine because rollovers are such chaotic events. Well, in other words, in the structural design of the roof, the engineer must calculate, you know, how much stress the members could absorb, right? Sure. The manufacturers know and test for that. And that's exactly – What was the manufacturer's testimony then? We designed this Ford Explorer, whatever it was, to withstand how many inches of crush at a 60-mile an hour rollover? Ford can't reasonably design the vehicle to withstand more crush than happened in this particular accident because – Say that again. Ford, through its testing and engineering, Ford knows that the roof in accidents like this might crush this much. But Ford can't reasonably design the vehicle to do more. And this would also get us into causation because there's volumes of evidence that roof crushes in accidents like this don't actually cause the injuries at all. And so – But these questions were subjected to a battle of the experts at trial, right? Precisely. And because all of these questions depend on expert testimony and are well outside of ordinary consumer expectations, the district court was correct to follow Sewell and say this is a case where the consumer expectations test really has no role to play. Well, I think the question in this case is, you know, how finally you should cut the consumer expectation test. In other words, I don't think anybody disagrees that the ordinary motor vehicle driver expects the roof of a hardtop not to crush, right? That's an ordinary expectation. But, of course, that's not built on, you know, being involved in two or three rollover accidents. But so that's – so, I mean, how finally should you cut that expectation? How much, you know, how much experience and knowledge does the ordinary consumer have to have in order for the consumer expectation to be reasonable? Isn't that the question here? Right. I think the consumer expectations test is limited to only those cases where the consumer's everyday experience would show that they kind of violated the very minimum safety expectations. Well, except that. Except that. Except that. Remember, I think it was Seventh Circuit. Some courts said, well, you know, it's reasonable for a consumer to expect that when you drive up to a signal and stop, the engine's not going to explode. But who's been in that situation? Nobody. But we expect that. The way that the California Supreme Court and subsequent cases draw the distinction is between cases that are race-ipsa-like, where just based on the facts of the accident, anybody can look at what happened and say we wouldn't expect that. That violates our minimum safety expectations. Let me ask you this question. This is not hypothetical. Remember there were these series of, I think they were Toyotas, but, you know, the car would start accelerating on its own and you couldn't turn it off and several people died in those accidents? I assume it was some kind of computer glitch. Now, was that, you think it's in the ordinary expectation of a consumer that, you know, when you take your foot off the gas and step on the brake, the car's going to stop? Well, sure, that would be a case, arguably, where the consumer expectations test would apply, just like the hypothetical examples that the Sewell case gives, where, you know, you don't expect a car to be sitting at a stoplight and then have the airbag go off with no accident whatsoever. So those are race-ipsa-like cases. But when you have a case like this where we're talking about degrees of roof crush in a catastrophic accident, and the only way you can determine whether that roof performed properly and should have been designed differently is through complicated expert testimony about how the car should have been designed differently, that is a case that the Sewell case clearly says applies only to consumer expectations, only the risk-benefit test. And, I mean, I notice within just a year, another panel of this Court addressed almost this exact issue in the Misery decision, did a routine application of Sewell, and said the District Court was absolutely correct that it's not a consumer expectations case, it's a risk-benefit case. There's no reason to treat this case differently than that one. It's indistinguishable. And, I mean, this is if the Court even gets to the question of consumer expectations, because I don't believe plaintiffs complied with Rule 51 to preserve the issue of whether they were even entitled to a consumer expectations instruction. They withdrew their request for that instruction before the Court had an opportunity to rule on it, and at that point they abandoned their theory. The fact that the side curtain airbag theory was also involved just reinforces the District Court's decision, because once the plaintiff introduced that national technology that Ford was just developing, there was no way that the jury could evaluate, could possibly have expectations about that aspect of the technology, and so absent any sort of instruction that plaintiffs had offered, that would have enabled the jury to parse between what aspects of the case allowed a consumer expectations analysis and which they concede required a risk-benefit analysis, the District Court couldn't have given the instructions plaintiff proposed and then never fought for. So I think — Well, I mean, I'm not sure how persuasive that argument is. By the end, when the parties met with the District Court to settle the jury instructions, it was the defense's clear position that the District Court had, in fact, ruled, and that ruling was final. So I don't know how you could be up here arguing that somehow it wasn't preserved when both sides thought the ruling had been finalized. Well, the ruling as to the motion in limine had been finalized. I think the — Well, but once you lose on the motion in limine, what's the point of putting out a jury instruction when that wasn't how you tried the case? Well, the court said that it would revisit its motion in limine rulings throughout trial if there was a basis to do so. And there's no evidence that they didn't present that would be relevant to the consumer expectations test that they claimed that they had that they didn't present. And so at the end of the case, once the evidence was in, they could have asked the court to revisit that issue, and they didn't. But in any event, it doesn't matter because on the merits, the District Court was correct that the consumer expectations test does not apply to a case like this. I think we've got your argument. Thank you. Thank you, Counsel. Can you, Counsel, address the last point that Counsel raised, which is that by the end of the evidence, there really wasn't any additional evidence to be presented? In other words, you wouldn't, from an evidentiary standpoint, try your case any differently than the question is really arguing a consumer expectation theory to the jury that you missed out on by not having that instruction. Is that an accurate statement? I'm sorry. I didn't mean to interrupt. The fair and candid answer is maybe. Evidence we did not put in. But I didn't make a proffer at trial, so I'm not really here trying to argue that. I'm trying to, you know, have integrity and argue what I think we're right on. But based on the Mansour case, which Ford relies upon, which I think is an outlier case, but in that case they talk about the owner's manual and marketing with regard to forming the expectations of the consumer. Now, that's a subjective analysis of what the client relied upon, so I think it's a wrong opinion. But we did have on our exhibit list marketing materials and the owner's manual to delve into that. So arguably we would have put that into evidence had we gone on the consumer expectation test. And one thing I want to just emphasize, if I answered that question satisfactorily, yes, Sewell is the controlling case. Everybody agrees with that. And when you look at all the cases, the out-of-state cases from Illinois and Florida and all the California cases, almost all of them, they all cite the Sewell. So even though Sewell stands for this, the defense likes to, you know, the manufacturers like to argue the proposition, they expect not the idling blow-up and the super simplistic race ipsa arguments we make, but in all these cases of high speed, 80-mile-an-hour rear-end crashes, airbags deploying or not deploying, seatbelts having inappropriate geometry and people submarining under them, all of those cases cite and rely on Sewell. So Sewell is not limited to that little blurb that unfortunately gets used in all of these cases. Romine, for example, which they call, they say is an outlier. Well, in that case, they petitioned the Supreme Court. The auto industry and all the auto industry's firms filed the meekest brief for the Supreme Court. Supreme Court said, no, we're not going to review it. Then they said, well, at least depublish it. And the Supreme Court said, no, we're not going to depublish it. So I would at least argue there is implied approval of that. I realize that doesn't mean that. But this went to the Supreme Court and had a lot of meekest briefs on it from folks throughout the country. And the Supreme Court said, no, we're going to let it stand. They must have felt it wasn't inconsistent with Sewell. And one of the things that was represented up here that Sewell stands for, and I reject that, is it does not stand for if it's too, if it's technologically feasible or has risk-benefit issues, you can't apply the consumer expectation test. That is, it is called the consumer expectation test, not the complexity of the product test. And when people are opposing this, they try to argue the complexities of it to make it seem like it's beyond the ordinary consumer's expectations or that they can't have one. But the courts have said the inherent complexity of the product itself is not controlling on the issue of whether the consumer expectation test applies. Consumers don't understand about sensing systems in airbags, geometry on seatbelts, whether a seat can withstand a 30-mile-an-hour impact or an 80-mile-an-hour impact. They might not know the engineering rationale behind that, just like the roof. But we've been driving a long time since Henry Ford started this a long time ago. And people have come to rely upon and formulate minimum safety assumptions. I think that in this instance, the jury had a right to have this instruction. They could have come back and said, you know, yeah, that was a big crash. That's what I expect a roof to do. I expect it to crash. But, Mr. Chase, with minimum safety instruction, minimum safety standards, we don't, we aren't in a position to articulate bright-line rules. So a minimum safety standard in this case would be that the roof remained on, for instance. It didn't just peel off. But the more nuanced argument that's been asserted is that the consumer should expect that it would collapse six inches and not nine. Right. But if a person had been maybe five feet, nine inches would have been okay. It wouldn't have affected them the same way. So isn't that a more nuanced argument than you're advancing? I'm not trying to advance that, so I apologize if it's coming across that way. We're not trying to say a roof can crush three inches but not eight. We're saying, and this thing crushed so much, it exposed Mr. Edwards' entire body. Our position is forget the inches. That's kind of not what we were intending to say in our briefing, and I think Ford might have put that in their briefs to use against us. I'm not sure. And if it comes across that way, I apologize. The argument is in a rollover accident, when a roof is essentially your safety cage and your roll cage, do you expect it to reasonably protect you or not? You're going to have some crush, just like when you get in a fender bender. Your car is going to crush and buckle, but you don't expect to die in those things, but you're going to have some damage. I think a jury has minimum safety expectations of what a roof ought to do, not to the degree of three inches versus six. I'm not trying to advocate that at all. But I think if they saw this roof, I mean, we've taken these cars and dropped them from 12 inches off the ground, flattened the roof down to the dashboard, take the same car for a $40 fix on the assembly line, and it bounces, one inch of crush doesn't even break the glass. You know, to argue that you can't reasonably design the vehicle to withstand a crash like this a moment ago, no, you can't, and it's been done. Does that mean that we default to the risk-benefit test? Well, we were going to use both in this trial because, to be perfectly candid, you know, sometimes in cases in Romine I chose to give you consumer expectation because I thought, you know what, I'm not going to muddy this up with risk-benefit stuff. The roof crush case, I thought, let's do both because I don't know. A consumer might say, I expect the roof to crush just like it did. So we were going to go after both theories, and I submit that Ms. Edwards had the right to have both theories submitted to the court. All right. We've taken you over your time. Thank you very much, both sides, for your argument. Thank you, Your Honors. I appreciate your time. Thank you. All right, we'll call the next case, which is Hendry v. Official Committee of Insecure Creditors of Wall Design.
judges: Tashima, Nguyen, Marbley